**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 31 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 99-2059

MARIA ROSARIO FUENTEZ,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 98-CR-231)**

John J. Kelly, United States Attorney, and Terri J. Abernathy, Special Assistant United States Attorney, of Las Cruces, New Mexico for Plaintiff-Appellee.

Thomas L. Wright, Law Offices of Gary Hill, of El Paso, Texas for Defendant-Appellant.

Before **BALDOCK**, **KELLY**, and **HENRY**, Circuit Judges.

**HENRY**, Circuit Judge.

Maria Rosario Fuentez appeals her conviction after a jury trial for

possession with intent to distribute less than 500 grams of cocaine (count 1) and

possession with intent to distribute more than 500 grams of cocaine (count 2) in violation of 21 U.S.C. §§ 841(b)(1)(B) & (b)(1)(C). She also appeals the denial of her motion for a new trial. Ms. Fuentez claims three errors by the district court require reversal of her conviction. First, she claims the district court violated her Sixth Amendment right of confrontation when it limited her cross examination of Officer Jerome Sedillo, the government's primary witness. Second, she alleges the district court impermissibly struck Mr. Eloy Juarez's testimony in her favor after he asserted his Fifth Amendment right to remain silent, when it waited to do so until after the jury began deliberations. Third, Ms. Fuentez insists the district court erred when it admitted potential hearsay suggesting that she was Mr. Juarez's drug "source." Finally, she contends that even if none of the aforementioned errors, standing alone, constitutes reversible error due to harmlessness, the errors cumulatively require reversal. Because we find no reversible error, we affirm Ms. Fuentez's conviction.

## I. BACKGROUND

### A. Proceedings Below

In April 1998, a federal grand jury in the District of New Mexico indicted Ms. Fuentez with two counts of possession with the intent to distribute cocaine. The trial jury returned a verdict of guilty on August 26, 1998, and the district

court sentenced Ms. Fuentez to a term of seventy-eight months' imprisonment on each count, to be served concurrently, followed by four years' supervised release. The charges and convictions stem from two drug transactions, the first involving the sale of approximately one ounce of cocaine in March 1997 and the second involving the sale of approximately one kilogram of cocaine in February 1999. The relevant facts follow, viewed in the light most favorable to the government, see United States v. Hughes, 191 F.3d 1317, 1321 (10th Cir. 1999).

### B. Factual Background

In 1997 and 1998, Officer Jerome Sedillo acted as an undercover narcotics officer for the New Mexico State Police in Roswell, New Mexico. In March 1997, Officer Sedillo's informant, Gerald Olguin, introduced Officer Sedillo to Mr. Eloy Juarez, a street-level cocaine dealer. Officer Sedillo attempted to purchase cocaine from Mr. Juarez, but Mr. Juarez had none. Mr. Juarez suggested they travel together to a residence located at 200 East Bonney in Roswell, where he spoke with the woman who answered the door. Upon returning to the vehicle, Mr. Juarez identified the woman as "Rosario" and described her as his "source."

Mr. Juarez's liaison with and description of the woman piqued Officer Sedillo's interest in her. Accordingly, he assigned Mr. Olguin, who did not know the woman, to learn her identity and whether she dealt drugs. Mr. Olguin later

informed Officer Sedillo that the woman was Ms. Fuentez and introduced the two on March 7, 1997.

Approximately one week later, Mr. Olguin arranged for Officer Sedillo to purchase cocaine from Ms. Fuentez. On March 19, 1997, Officer Sedillo met Ms. Fuentez at her restaurant, and tape-recorded the transaction and conversation that followed. They entered the restaurant's kitchen, and Ms. Fuentez delivered a bag of cocaine to Officer Sedillo in exchange for $1,000. During the tape-recorded transaction, Ms. Fuentez demonstrated a knowledge of the fair market value of the product, noting that this ounce was particularly expensive.

After completing the one-ounce purchase, Officer Sedillo inquired as to whether Ms. Fuentez could obtain a kilogram of the controlled substance. She responded with two options, a kilogram from a local source for $22,000 or a kilogram from her Phoenix source at a cost of $15,000. In response to Officer Sedillo's question about the appropriate manner of payment, Ms. Fuentez stated that he would be required to offer one-half of the total in advance, and pay the final amount upon delivery. Ms. Fuentez then agreed to Officer Sedillo's request for a few days to gather the money and call her at the restaurant.

Officer Sedillo called Ms. Fuentez as agreed, but she informed him that she had nothing to offer. He received the same response when he called a few weeks later. He called again the following month and was again turned away. As a

result of having been turned away, Officer Sedillo suspected that his identity as an undercover police officer had been revealed. He received permission from Ms. Fuentez to call her in the future, then left Roswell to conduct other investigations elsewhere in New Mexico.

Upon his return to Roswell in February 1998, Officer Sedillo elected to continue his investigation of Ms. Fuentez. He re-established contact with Mr. Olguin, who arranged a transaction with Ms. Fuentez. Officer Sedillo contacted Ms. Fuentez at the restaurant on February 16, 1998. Because the kilogram had not yet arrived, Ms. Fuentez requested and received Officer Sedillo's cellular telephone number, assuring that the transaction would take place.

Ms. Fuentez called Officer Sedillo at approximately 9:00 p.m. that evening and invited him to the restaurant. While other officers observed from nearby, Officer Sedillo arrived at the restaurant. Ms. Fuentez arrived a few minutes later and led Officer Sedillo into the office. Therein, she removed a one-kilogram brick of cocaine from a plastic bag. Officer Sedillo and another police officer then arrested Ms. Fuentez, who confessed while in police custody after receiving her recitation of rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966).

During cross-examination at trial, Ms. Fuentez admitted that on February 16, 1998 she received the kilogram of cocaine from her nephew, who lived in Phoenix. Ms. Fuentez also admitted that prior to her initial sale to Officer

Sedillo, she had participated in a one-kilogram drug transaction with a woman named Alicia Salcido.

## II.  DISCUSSION

Ms. Fuentez asserted an entrapment defense as to each of the two counts against her.  According to Ms. Fuentez, entrapment as a matter of law occurred during the one-ounce transaction because the government was both the source and the final purchaser of the drug.  Ms. Fuentez claims she was entrapped during the one-kilogram transaction, because Officer Sedillo and confidential informant Gerald Olguin pressured her into obtaining and selling the drugs.  She claims the following errors prevented her from prevailing on that defense: (1) her inability to cross-examine Officer Sedillo; (2) the judge's belated striking of Mr. Juarez's testimony; and (3) the judge's improper admission of hearsay testimony.  Ms. Fuentez also contends that the alleged errors in the aggregate require reversal. We shall consider each contention in turn.

### A.  Limitation on Cross-Examination of Officer Sedillo

Ms. Fuentez argues that the district court infringed on her Sixth Amendment right of confrontation in connection with her presentation of an entrapment defense when it refused her efforts to cross-examine Officer Sedillo

regarding an internal affairs investigation. Apparently, on June 11, 1998, approximately three months after Ms. Fuentez's arrest, Officer Sedillo engaged in an unauthorized undercover drug operation. He admitted to making a false statement to his supervisor regarding the undercover operation and another officer offered to falsify that there was surveillance on the scene when none was present. The investigation resulted in Officer Sedillo's removal from narcotics assignments to uniformed patrol as a result of his lack of truthfulness and failure to observe department regulations.

The district court noted Ms. Fuentez's arguments that the evidence may be admissible under either Fed. R. Evid. 608 as a specific instance of conduct that might attack his credibility, or under Fed. R. Evid. 404(b) to demonstrate Officer Sedillo's propensity to lie and to therefore undermine his credibility. Relying on Fed. R. Evid. 403, the district court refused to allow Ms. Fuentez to ask any questions relating to the Internal Affairs investigation or the attempted deception. The court stated that such inquiry would "detract from the proper focus of the charges," resulting in a "trial within a trial." Aplt's App. at 15 (Memorandum Opinion Denying New Trial). The district court based its ruling primarily on the fact that the disciplinary action was on appeal at the time of trial and there was some controversy as to what exactly took place during the investigation. Ms.

Fuentez claims this limitation on the scope of cross-examination infringed on her Sixth Amendment right of confrontation.

The complete denial of access to an area properly subject to cross-examination infringes on the Sixth Amendment right of confrontation, and constitutes reversible error. See United States v. Jorgenson, 451 F.2d 516, 519 (10th Cir. 1971). On the other hand, merely limiting the scope of cross-examination is a matter well within the trial judge's discretion and such an error "will not lead to reversal unless an abuse of discretion, clearly prejudicial to the defendant, is shown." United States v. Valentine, 706 F.2d 282, 288 (10th Cir. 1983); see also United States v. Polk, 550 F.2d 1265, 1269 (10th Cir. 1977) ("A complete denial of access to an area properly subject to cross-examination constitutes reversible error, but the extent of cross-examination is discretionary with the trial judge.").

The record reveals that Ms. Fuentez was not precluded from inquiring into an entire area of cross-examination, in this case, Officer Sedillo's credibility. The district court allowed Ms. Fuentez to cross-examine the officer on subjects relating to his credibility, including the extent of his relationship with Mr. Olguin (his confidential informant) and his failure to include a criminal complaint for automobile theft in the informant file. Thus, because Ms. Fuentez was allowed to

attack Officer Sedillo's credibility, we review the district court's decision for an abuse of discretion.

Ms. Fuentez claims the evidence of Officer Sedillo's behavior during the internal affairs investigation was vital for an assessment of his credibility, as it demonstrated bias and a propensity to lie regarding drug investigations. She further argues that Officer Sedillo's testimony was "critical to the Government's case," so she had "a right to attack [his] credibility by wide-ranging cross-examination." United States v. Morales-Quinones, 812 F.2d 604, 613 (10th Cir. 1987). We agree that "[d]efense counsel should ordinarily be given wide latitude when cross examining a witness about credibility or bias." United States v. DeSoto, 950 F.2d 626, 629 (10th Cir. 1991). "The trial court, however, retains discretion to reasonably limit cross-examination . . . ." Id.

The trial court noted "[i]t is not at all clear either Rule 608 or Rule 404(b) would sanction" the introduction of evidence of the internal affairs investigation and Officer Sedillo's misrepresentations to his supervisors. See Aplt's App. at 15. Rule 608 would have allowed a question regarding Officer Sedillo's current status with the narcotics division to be asked, but it would have also prevented Ms. Fuentez from introducing extrinsic evidence of Officer Sedillo's alleged dishonesty. As the Advisory Committee Notes state:

> (2) Particular instances of conduct, though not the subject of criminal conviction, may be inquired into on cross-examination of the

principal witness himself or of a witness who testifies concerning his character for truthfulness. Effective cross-examination demands that some allowance be made for going into matters of this kind, but the possibilities of abuse are substantial.

Fed. R. Evid. 608(b) Advisory Committee Notes.

We agree that "[t]here may indeed be situations in which evidence from . . . internal investigations will bear heavily on the credibility of a testifying police officer." United States v. Johnson, 968 F.2d 765, 767 (8th Cir. 1992). Thus, while the admission of testimony regarding the investigation would have been proper, especially with the defense of entrapment raised here, we cannot say the trial court abused its discretion when it limited the scope of inquiry as to that topic. As the Notes relate, the "substantial" possibilities of abuse in this area require safeguards including disallowing the use of instances that are remote in time, requiring the instances to be probative of truthfulness, and subject to the overriding protections of Rule 403. See id.

Here the matter was certainly probative of truthfulness–the department's disciplining of the officer underscores that, and the incident occurred about three months after the defendant's arrest. Further, it is not clear that the sought-after cross-examination was "substantially removed from [Ms. Fuentez's] attempt to prove that [s]he was not predisposed to commit the crimes alleged in the indictment and thus bore only faint relation to [her] entrapment defense." United States v. Crump, 934 F.2d 947, 953 (8th Cir. 1991).

-10-

But, the testimony of Officer Sedillo was corroborated by other evidence, including the recordings and Ms. Fuentez's own confession. Ms. Fuentez also appeared well-versed in the value of cocaine, even negotiating prices from multiple sources during the taped transactions. She invited Officer Sedillo to call on her for cocaine in the future. She admitted to participating in a past one-kilogram drug transaction, and to selling the drugs because her nephew desired her to do so. The district court noted this corroborating evidence, and ruled that under Rule 403 the confusion the inquiry would have caused outweighed its probativeness. Although close, we do not see an abuse of discretion nor a showing of prejudice here. Cf. United States v. Hamell, 3 F.3d 1187, 1189 (8th Cir. 1993) (where officer's sanction of dismissal, two years after the defendant's arrest was unrelated to the defendant's trial, other evidence corroborated the officer's testimony, and officer's testimony "only marginally relevant," district court's disallowance of cross-examination not an abuse of discretion.) Accordingly, we cannot conclude that Ms. Fuentez's confrontation rights were violated by the district court's limitation on cross-examination as it related to her entrapment defense.

### B. Striking of Mr. Juarez's Testimony

Although the "[s]triking [of] the testimony of a witness is a drastic remedy not lightly invoked," United States v. McKneely, 69 F.3d 1067, 1076 (10th Cir. 1995), we review the district court's decision to strike testimony for abuse of discretion. See id.

During her trial, Ms. Fuentez asserted an entrapment defense, arguing that Officer Sedillo and Mr. Olguin pressured her to sell drugs. She also attempted to establish entrapment as a matter of law by demonstrating a circular transaction occurred, i.e., the government supplied her the drugs through Mr. Olguin and he purchased the drugs from her through Officer Sedillo. In support of that defense, she called Mr. Eloy Juarez to testify on her behalf.

Before Mr. Juarez testified, the district court informed him of his Fifth and Sixth Amendment rights. Mr. Juarez then testified that Mr. Olguin gave him an ounce of cocaine in March 1997, asking him to hold it because Mr. Olguin feared being caught by the police while possessing it.

The government then requested a bench conference, during which it urged the court to once again remind Mr. Juarez of his right to counsel. The court did so, and Mr. Juarez requested an attorney, then met with a court-appointed attorney during the court's recess.

When direct examination resumed, Mr. Juarez asserted his Fifth Amendment privilege, refusing to answer any further questions regarding the

ounce of cocaine at issue in the March 1997 transaction. The government moved to strike Mr. Juarez's testimony on the basis that the invocation of his Fifth Amendment privilege denied it the opportunity to cross-examine the witness.[1] At the time of the objection, there was apparently some confusion as to whether the government's motion to strike referred to all of Mr. Juarez's testimony or merely to his invocation of his rights.

However, during the jury deliberations, the jurors forwarded a question to the judge indicating they were aware that Mr. Juarez had testified to the receipt of drugs from Mr. Olguin, then later asserted his Fifth Amendment privilege. The jury stressed the importance of their considerations, stating "this is critical." Supp. App. vol. VI, at 20. The district judge then instructed the jury to disregard

---

[1] Ms. Fuentez's counsel, outside the presence of the jury, summarized the testimony she expected Mr. Juarez to offer as follows. In February or March 1997, Mr. Olguin provided an ounce of cocaine to Mr. Juarez, asking him to hold it until police pressure on Mr. Olguin dissipated. Shortly thereafter, Mr. Juarez asked Ms. Fuentez to hold that same ounce, because he feared being caught with it while driving under the influence of alcohol. Ms. Fuentez apparently stored the ounce in her home, because when Messrs. Juarez and Olguin visited the restaurant a few days later to retrieve the drug, it was not there. There the two men informed her that Mr. Olguin actually owned the drugs and planned a sale.

Ms. Fuentez claims that the next day, Officer Sedillo visited the restaurant, informed her that he was the purchaser of the ounce, and paid her $1000. Ms. Fuentez claims the ounce she sold was the same ounce owned by Mr. Olguin and delivered by Mr. Juarez. She asserts this "circular transaction" constitutes entrapment as a matter of law. See United States v. Bueno, 447 F.2d 903 (5th Cir. 1971).

-13-

any uncounseled testimony to which Mr. Juarez later invoked his Fifth Amendment right.

When Mr. Juarez invoked his Fifth Amendment rights after returning from a recess to confer with counsel, the government moved to strike his earlier testimony to the effect that Mr. Olguin had given him an ounce of cocaine in March of 1997. Ms. Fuentez sought to use this testimony to advance her theory of entrapment as a matter of law–that the government had supplied the cocaine through Mr. Olguin, delivered it through Mr. Juarez and purchased it through Officer Sedillo. Unfortunately, the district court did not strike the testimony at that time, and later the jury sent a question to the judge which resulted in his striking the testimony after the jury had begun deliberations.

While the government notes that its inability to question Mr. Juarez means that his testimony would have to be stricken, Ms. Fuentez argues that this striking removed evidence in support of her entrapment defense from the jury. In addition, she argues the striking of the testimony proscribed any opportunity to present the evidence in other ways, in violation of her Fifth Amendment right to due process and her Sixth Amendment right to compulsory process.

The right to present witnesses is essential to due process just as the right to present witnesses under the Sixth Amendment is meaningful only if those witnesses may present their testimony. See United States v. Esparsen, 930 F.2d

-14-

1461, 1469 (10th Cir. 1991).  These rights, however, "are not absolute," as one cannot invoke her Sixth Amendment rights in support of her presentation of a half-truth, free from the "legitimate demands of the adversarial system."  Taylor v. Illinois, 484 U.S. 400, 412-13 (1988); see Esparsen, 930 F.2d at 1469 ("Reaching the truth is a fundamental goal of trials and cross-examination is critical to the process.").

We further explained in Esparsen that

> [a] defendant cannot invoke due process or compulsory process rights to immunize his witnesses from cross-examination on issues relevant to the truth of the direct testimony. . . . When the refusal to answer cross-examination questions involves collateral matters, we have held in the analogous situation of a prosecution witness who invokes the Fifth Amendment that the testimony should not be struck.

Id. (internal quotations omitted); see United States v. Nunez, 668 F.2d 1116, 1122 (10th Cir. 1981).

When a nonparty witness takes the stand and testifies, he "obviously waives whatever privilege he may have had to refuse to answer the questions that he answers."  United States v. Seifert, 648 F.2d 557, 661 (9th Cir. 1980).  The district court, in its order denying Ms. Fuentez a new trial, and in retroactively striking Mr. Fuentez's testimony, correctly balanced all of these "competing concerns by drawing a line between direct and collateral matters."  Id; United States v. McKneely, 69 F.3d 1067, 1075-76 (10th Cir. 1995).

Because Mr. Juarez's testimony regarding his handling of the cocaine went to matters put at issue by the indictment, that is, Ms. Fuentez's involvement in the transaction, the testimony was non-collateral, or direct. See McKneely, 69 F.3d at 1076; Williams v. Borg, 139 F.3d 737, 742-43 (9th Cir. 1998) (explaining distinction between collateral and non-collateral testimony). Because the truth-seeking function of the court would be impaired, and because the questions Mr. Juarez refused to answer were germane to issues in the indictment, the testimony was not collateral. See McKneely, 69 F.3d at 1076; Esparsen, 930 F.2d at 1470. Because his testimony was not reliable without subsequent cross-examination, it was properly, although very belatedly, excluded.

The government admits, in rare candor, that "it may have been better for the district court to strike the testimony immediately after Juarez invoked his Fifth Amendment rights," but counters with the argument that any error would be harmless because the only other source available to Ms. Fuentez to make this argument would have been Mr. Olguin, who was subpoenaed but did not show up at trial. The defendant simply asserts, without explanation, that "the court deprived the defendant of the opportunity to call Mr. Olguin or other witnesses who could have provided the same factual testimony as Mr. Juarez." Aplt's Br. at 14.

Although Ms. Fuentez did not point to specific evidence on appeal, the record indicates that Mr. Olguin did not respond to a subpoena to appear. We note that the government's witness, Officer Sedillo, acknowledged during cross-examination that he did not want Mr. Olguin to testify as a witness in this case, but there is no evidence Officer Sedillo had contact with Mr. Olguin immediately before the trial. Further, Mr. Olguin was not designated to be a material witness and the expected content of his testimony was not certain. During trial, several hours after it was apparent Mr. Olguin had not arrived to testify, Ms. Fuentez requested the court to grant a continuance, issue a bench warrant for Mr. Olguin, and moved for a mistrial, all of which the court denied. Finally, during the recess while the jury was deliberating, Ms. Fuentez also asked for a grant of immunity for Mr. Juarez: the government declined and the court refused to order the government to do so.

Although it would have been preferable for the court to have ruled at the time of the first motion, we cannot say that the district court abused its discretion in its decision to correct that error when it became clear that the jury was confused.

### C. Drug Source Hearsay

Ms. Fuentez claims the trial court improperly admitted testimony by Officer Sedillo that Ms. Fuentez was Mr. Juarez's drug source. See Aplt's App. 49-56 (Trial Transcript of Officer Sedillo's testimony). Officer Sedillo testified that when he attempted to purchase cocaine from Mr. Juarez in March 1997, Mr. Juarez had none. He further testified that Mr. Juarez took him to "Rosario's" (Ms. Fuentez's) house and named her as his source.

At trial, Ms. Fuentez objected to Officer Sedillo's testimony on the basis that it was excludable hearsay. For the first time, on appeal Ms. Fuentez claims the "source" evidence was improper character evidence that should have been excluded under Fed. R. Evid. 404(b). The government claims the evidence was properly admitted for a nonhearsay purpose: to demonstrate the basis for Officer Sedillo's interest in Ms. Fuentez, and that the district court provided a proper limiting instruction. The government further argues that Ms. Fuentez waived her 404(b) argument by not raising it at trial.

### 1. *Admission for a Nonhearsay Purpose*

We review the district court's evidentiary rulings for an abuse of discretion. See United States v. Wilson, 107 F.3d 774, 780 (10th Cir. 1997). Given the fact specific nature of hearsay objections, we accord greater deference to the district

court's hearsay rulings. See United States v. Trujillo, 136 F.3d 1388, 1395 (10th Cir. 1998).

Hearsay is a out-of-court "statement . . . offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c), excluding, of course, certain prior witness statements and admissions by party-opponents, see Fed. R. Evid. 801(d). During Officer Sedillo's testimony, the government offered the statement by Mr. Juarez not to show that Ms. Fuentez was actually Mr. Juarez's drug supplier, but rather to demonstrate Officer Sedillo's reason for investigating her. See United States v. Freeman, 816 F.2d 558, 563 (10th Cir. 1987) (holding a statement was not hearsay "when offered for the limited purpose of explaining why a Government investigation was undertaken"). We hold the district court correctly admitted the evidence for a nonhearsay purpose.

### 2.    *Exclusion Under Fed. R. Evid. 404(b)*

Because Ms. Fuentez did not object to the statement on the basis of the limitation on character evidence included in Fed. R. Evid. 404(b), we review the district court's failure to exclude the evidence on that basis for plain error. See United States v. Martinez, 76 F.3d 1145, 1150 (10th Cir. 1996). Under this standard, we will reverse a district court only if we determine that "admitting the statement placed the underlying fairness of the entire trial in doubt" or affected

Ms. Fuentez's substantial rights. United States v. Hill, 60 F.3d 672, 675 (10th Cir. 1995); see also United States v. Culpepper, 834 F.2d 879, 883 (10th Cir. 1987) ("Under the plain error standard, reversal is mandated only to correct particularly egregious errors, that is, those errors that seriously affect the fairness, integrity, or public reputation of Judicial proceedings." (internal quotations omitted)).

According to Fed. R. Evid. 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

"The grounds specified for admissibility are not exclusive; evidence of other crimes or acts relevant to any issue at trial may be admitted unless this evidence tends to prove only criminal disposition." Culpepper, 834 F.2d at 883.

We addressed a nearly identical allegation of error in Hill, wherein the defendant failed to object on the basis of 404(b) to a statement that he was a "drug dealer." Hill, 60 F.3d at 675. We held there was no plain error because the statement was an isolated remark in the context of the entire trial, the declarant was subject to examination, and the judge properly instructed the jury regarding the use of the testimony. See id. As in Hill, the statement was isolated within the context of the trial, Ms. Fuentez called Mr. Juarez, who made the statement, to

testify, and the judge provided a proper limiting instruction.  We hold that admitting the statement did not constitute reversible plain error.  See id.

### D. Cumulative Error

Finally, Ms. Fuentez argues that even if not reversible individually, the cumulative effect of her alleged trial errors requires reversal.  "The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. The purpose of a cumulative-error analysis is to address that possibility."  United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990).  See, e.g., United States v. Wallace, 848 F.2d 1464, 1475 (9th Cir. 1988) ("Although each of the above errors, looked at separately, may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial to the appellants that reversal is warranted.").  "We evaluate whether cumulative errors were harmless by determining whether defendant's substantial rights were affected."  McNeely, 69 F.3d at 1080.  Because we identified but one error in this case there is no basis for a cumulative error determination.

### III.  CONCLUSION

For the reasons stated above, we AFFIRM Ms. Fuentez's conviction.